1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| | |
|---|---|
| ANTONIO PRECIADO PALAMINOS,<br><br>            Petitioner,<br><br>   v.<br><br>MIKE MCDONALD, Warden,<br><br>            Respondent. | ) 1:09-cv—1682-AWI-BAM-HC<br>)<br>) FINDINGS AND RECOMMENDATIONS TO<br>) DENY THE PETITION FOR WRIT OF<br>) HABEAS CORPUS  (DOC. 1)<br>)<br>) FINDINGS AND RECOMMENDATIONS TO<br>) ENTER JUDGMENT FOR RESPONDENT AND<br>) TO DECLINE TO ISSUE A CERTIFICATE<br>) OF APPEALABILITY<br>)<br>) **OBJECTIONS DEADLINE:**<br>) **THIRTY (30) DAYS** |

18
19
20
21
22
23
24
25
26
27
28

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Pending before the Court is the petition, which was filed in the Sacramento division of this Court on September 17, 2009, and transferred to this Court on September 23, 2009.  Respondent filed an answer and supporting documentation on September 10, 2010, and Petitioner filed a traverse on May 23, 2011.

I.  Jurisdiction

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997), cert. denied, 522 U.S. 1008 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. §§ 2254(a), 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. –, -, 131 S.Ct. 13, 16 (2010) (per curiam).

Petitioner, an inmate of the High Desert State Prison, claims that he suffered violations of his constitutional rights when he was found guilty of criminal offenses in the Superior Court of the State of California for the County of Madera. Further, the challenged conviction was suffered in Madera County, which is located within the jurisdiction of this Court.  28 U.S.C. §§ 2254(a), 2241(a), (d).

Respondent Ken Clark answered the petition on behalf of Warden Mike McDonald.  (Doc. 17, 1:16-17.)  Petitioner thus named as a respondent a person who had custody of the Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules).  See, Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).

Accordingly, the Court concludes that it has jurisdiction

1    over the proceeding and over the Respondent.

2        II.  <u>Procedural Summary</u>

3        On December 14, 2007, after a court trial, Petitioner was

4    found guilty in Madera County Superior Court case number

5    MCR025574 of five counts of second degree murder in violation of

6    Cal. Pen. Code § 187, five counts of gross vehicular manslaughter

7    while intoxicated in violation of Cal. Pen. Code § 191.5(a),

8    leaving the scene of an accident in violation of Cal. Veh. Code

9    § 20001(a), vehicle theft in violation of Cal. Veh. Code

10   § 10851(a), attempted vehicle theft in violation of Cal. Pen.

11   Code § 664 and Cal. Veh. Code § 10851(a), grand theft in

12   violation of Cal. Pen. Code § 487(a), and driving without a

13   license in violation of Cal. Veh. Code § 12500(a).  (LD 1, 215,

14   192-216.)[1]  On December 17, 2007, the trial court further found

15   true the special allegation pursuant to Cal. Veh. Code § 20001(c)

16   that Petitioner had fled the scene of the killing.  (<u>Id.</u> at 217.)

17       On January 15, 2008, the court sentenced Petitioner to five

18   consecutive terms of fifteen (15) years to life on the murder

19   counts plus a determinate term of four years on the theft

20   offenses and leaving the scene of an accident; the other terms

21   and enhancements were stayed.  (<u>Id.</u> at 282-86.)

22       On appeal to the California Court of Appeal, Fifth Appellate

23   District (DCA), Petitioner's convictions were affirmed in case

24   number F054625 on April 30, 2009.  (Resp.'s Ex. A, doc. 17-1.)

25       Petitioner's petition for review filed in California Supreme

26   Court action number S173552 was denied summarily on July 22,

27   
28           [1] "LD" refers to lodged documents, which were submitted by Respondent in
     support of the answer.

1  2009.  (LD 7.)

2      A petition for writ of habeas corpus subsequently filed in

3  California Supreme Court case number S181014 was denied summarily

4  on October 13, 2010.  (LD 8.)[2]  Petitioner did not raise in the

5  habeas petition the claims that he raises in the petition pending

6  before this Court.

7      III.  Factual Summary

8      In a habeas proceeding brought by a person in custody

9  pursuant to a judgment of a state court, a determination of a

10  factual issue made by a state court shall be presumed to be

11  correct; the petitioner has the burden of producing clear and

12  convincing evidence to rebut the presumption of correctness.  28

13  U.S.C. § 2254(e)(1); Sanders v. Lamarque, 357 F.3d 943, 947-48

14  (9th Cir. 2004).  The following factual summary is taken from the

15  unpublished opinion of the California Court of Appeal, Fifth

16  Appellate District, in case number F054625.  See, Galvan v.

17  Alaska Dep't. Of Corrections, 397 F.3d 1198, 1199 n.1 (9th Cir.

18  2005) (setting forth a factual summary from the state appellate

19  court's decision).

20      On July 3, 2006, 36-year-old Celia Berber and her
   family were visiting Celia's mother in Modesto. They
21   left Modesto in their Toyota at about noon and headed
   for home in Lindsay. Celia was driving and her husband,
22   Balentin Llerenas, sat in the front passenger seat.
   Their three children, sixteen-year-old Sulema Alvarez,
23   10-year-old Andoney Llerenas and four-year-old Brian
   Llerenas, were in the back seat.

24

25      [2] The Court may take judicial notice of facts that are capable of
   accurate and ready determination by resort to sources whose accuracy cannot
26   reasonably be questioned, including undisputed information posted on official
   web sites.  Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331,
27   333 (9th Cir. 1993); Daniels-Hall v. National Education Association, 629 F.3d
   992, 999 (9th Cir. 2010).  It is appropriate to take judicial notice of the
28   docket sheet of a California court.  White v Martel, 601 F.3d 882, 885 (9th
   Cir. 2010), cert. denied, 131 S.Ct. 332 (2010).

A., an equipment driver with a special license to pull heavy equipment, decided to stop by his father's house on Road 29. A. was driving a Chevy heavy-duty pickup truck pulling a bulldozer on a trailer (together, the rig). A. was the only person who drove the truck, and he had attached the trailer and bulldozer himself. The trailer was a "fifth wheel" or gooseneck trailer that sat over the truck's rear axle. The bulldozer was tied down to the trailer with binders and chains in both front and back, as required by law. When the truck was pulling weight, it was harder to stop, but the brakes on the truck and the trailer were regularly maintained and serviced. That day, A. had set the truck's brake controller to 7.5 out of 10 to accommodate the load he was pulling and the brakes were working well with the load.

Shortly before A. arrived at his father's house, his relative, B., was outside the house. B. noticed a man across the street, about 45 feet away, looking into the neighbor's car. The man was thin and in his twenties. He was wearing a dark shirt and pants and was carrying some type of black bag. B. paid little attention because she thought the man was one of the neighbor's friends. She went back inside the house. Later, the neighbor's car was found in disarray.

When A. arrived at his father's house, he parked the rig on the side of Road 29. He left the keys in the ashtray and the doors unlocked. He went in to check on his father and returned in 10 minutes to find the rig gone. He had not given anyone permission to take it. He looked down the road and saw the rig in the distance.

C., a contractor in heavy equipment, was driving a full-sized pickup truck on Road 29 when he saw the rig about one-half mile away and approaching in the wrong lane. The rig rode on the shoulder of the wrong lane, crossed back to the other side of the road, and then almost ran off the shoulder on that side. The trailer was "sliding." Dust from the shoulder flew up from the back of the truck and the trailer. The rig then traveled in the proper lane as it approached C.'s truck. C. had slowed to about 25 miles per hour as he watched the rig. The rig again drifted completely into the wrong lane, traveling at a "pretty fast pace," and the vehicles were about one hundred yards apart. C. took evasive action, driving his truck entirely off the road and onto the shoulder. If he had not done so, the rig would have hit him head-on. As he drove off the road, C. thought the truck was going to hit his door panel directly, but then the truck drifted back into its lane, and C. thought the trailer and bulldozer would sideswipe his truck. C. looked directly at defendant because C. wondered if he knew the driver and

5

if the driver even saw him there. Defendant's eyes were open wide and he "looked like he was absolutely scared to death." The trailer did not swerve, but it missed C.'s truck by about 12 inches. C. was grateful he had not been killed. C. continued to watch the rig as it passed and he saw no brake lights. He also heard no sound of the trailer braking, a distinctive sound with which he was very familiar. He watched the rig in his rearview mirror until it went over a hill and out of sight.

D., a painting contractor, was painting the interior of a building on Road 29. At about 1:00 p.m., he went out to his van to start cleaning up. As he stood in the parking lot, he noticed the rig traveling at a "pretty good rate of speed" on Road 29. He was concerned because he knew there was a stop sign up ahead at Avenue 12. After the rig went by, D. heard brakes lock up, followed by a crash. He looked up from his van and saw a car in flames. D. called 911 and drove toward the crash.

Defendant had driven through the stop sign. The truck collided with the Toyota carrying Celia and her family and pushed it into the bridge rail. As the truck ran into the bridge rail, the trailer jackknifed and hit the car a second time. The car caught fire.

E. was driving on Avenue 12, preparing to turn, when he suddenly saw the rig pushing the Toyota up against the rail. E. parked in front of D.'s van and got out. He saw defendant running away from the scene and in his direction. Defendant looked anxious and scared. E. told him he should go back to the accident. Defendant got angry and asked E. who he was and why he (defendant) had to answer to him. Defendant took off his shirt and cleaned some blood off his arms and shoulders. He said something nonsensical about his sister being there and he continued past E.

E. ran to the scene and saw Celia on the ground beside the Toyota, which was in flames. E. and two other men pulled her away from the car. E. saw four burning figures still inside. Celia asked for water and someone poured water on her face. Celia told them her name, and the name and telephone number of her mother.

D. saw defendant flag down a pickup truck with his shirt. Defendant got in the truck and it drove away.

When F., a paramedic, arrived, the Toyota was still on fire and Celia was on the pavement. Celia was completely alert and oriented. She was aware of what was going on. She had a broken ankle and arm, and about 70 or 75 percent of her body had second and third

degree burns. She told F. that "some bastard had hit her with the ... white truck and that he took off running and that the car caught on fire and everybody was still inside." She said the truck had cut in front of her. She told F. her name and told her to go help her children and husband. She said she could not believe what was happening; she was aware that her husband and children were still in the burning car. She kept telling F. not to help her, but to go help her children. She told F. she wanted to die. F. transported Celia to University Medical Center in Fresno.

Celia's husband and three children, who had incurred various injuries in the collision, burned to death in the car. Later, Celia also died from her burns.

An officer arrived to find the Toyota crushed against the rail and burned. Four burned figures remained inside. Celia had been taken to the hospital. A black T-shirt was hanging on the gooseneck portion of the trailer. In the debris field around the truck, the officer found a black CD case and various papers in the name of the neighbor who lived on Road 29. The papers included the neighbor's car registration.

The accident investigation team determined that the truck hit the Toyota and pushed it sideways in the direction the truck was traveling and into the bridge rail. The truck was rated to carry 22,000 pounds and it was 8,467 pounds overweight at the time. This had a detrimental effect on its braking ability, as though the rig had been going 10 miles per hour faster than it was, but there was still ample distance (751 feet) for the rig to stop between the stop ahead sign and the stop sign. The approach to the sign was inclined and slightly curved. If defendant had merely taken his foot off the throttle at that point, the rig would likely have come to a stop at the sign.

The speed limit on Road 29 was 55 miles per hour. Two digital security cameras on a nearby business allowed officers to calculate defendant's speed on Road 29 as between 61 and 65 miles per hour.

The sensing and diagnostic module in the truck revealed that about five seconds before the air bags were deployed, the truck was going 61 miles per hour and the brakes were not in use.FN2 About three seconds before deployment, the truck was going 52 miles per hour and the brakes were activated. About two seconds before deployment, the truck was going 44 miles per hour and the brakes were still activated. Thus, defendant had attempted to stop the truck.

   FN2. More precisely, these events were

7

recorded in relation to the activation of the air bag system, not the deployment of the air bags, which occurred about 0.12 seconds after activation.

At about 6:20 p.m. on the same day, an officer was dispatched to Mearl's Market. A male had reported being assaulted, but had hung up on the dispatcher without giving his name or any other information. When the officer entered the market, he could locate no victim and the clerk was aware of none. The officer exited and saw a blue Chevy van parked nearby. Defendant was sitting in the driver's seat. The officer asked him if he knew of any assault victims in the vicinity. Defendant said he had seen the victims walking down a particular street. The officer searched for the victims, then returned to the blue van where defendant was still sitting. Defendant was looking around inside the van. He was sweating and appeared nervous. He smelled strongly of alcohol, which was consistent with having consumed alcohol within the last hour or two. Defendant never told the officer he had been attacked, that he was running from anyone or that he was scared. The officer noticed some wires hanging underneath the steering column area and he thought defendant was trying to hot-wire the van.

The officer recalled being briefed on a hit-and-run accident earlier in the day. The suspect had tattoos, scratches on his arms and was wearing Adidas shoes. The officer observed tattoos on defendant and asked him to lift up his sleeve. Defendant had long scratches on his left arm. When defendant removed his shirt, the officer saw a bruise on his neck and left chest area, which the officer recognized as the type sustained when wearing a seat belt during a vehicle collision. Defendant was wearing Adidas shoes. The officer arrested defendant, but did not inform him he was suspected of being involved in an accident in which people had died.FN3

FN3. The owner of the van, who lived near Mearl's Market, had not given defendant permission to be inside his van.

F., the paramedic, was dispatched to Mearl's Market regarding an assault. When she arrived, two or more officers were present. F. administered medical aid to defendant, who claimed he had been beaten up by three men. He had multiple abrasions and bruising to his arms and chest. He had an abrasion to the left clavicle that was consistent with a seat belt mark and an automobile accident. Defendant was very rude. He made several remarks, even though no one was speaking to him. He said he did not understand why he was under arrest because he had not killed anyone and had not done

8

anything. Defendant was slurring his speech, he smelled of alcohol and his eyes were red and glossy. F. asked him if he had been drinking or taking drugs, and he said he had not. Defendant was transported to the hospital by ambulance.

An officer also observed that defendant smelled of alcohol and was unsteady on his feet. The officer believed defendant was under the influence of alcohol.

An officer rode along in the ambulance. Defendant was smiling and appeared to be under the influence of alcohol. The officer saw no sign that defendant was under the influence of a stimulant or a narcotic. When defendant was informed at the hospital about the death of the three children and their father, he smiled and laughed.

A nurse in the emergency room spoke Spanish and was able to translate for the other nurses and the officers. When the nurse spoke to defendant, he told her that "he had four tall beers, the 40 ounces, and that he had used meth that morning."

On cross-examination, the nurse explained more specifically that she asked defendant "[D]o you drink today[?]" and "Do you use drugs[?]" Defendant said he drank four tall beers-his actual words were "'Cuatro cervezas de la botella grande'"-and used methamphetamine. The nurse co she had asked him when he drank the beers. She did ask him when he used methamphetamine and he said he had used it that morning.

A nurse's note in the medical records stated that defendant "admit[ted] to drinking and methamphetamine use today[.] $20 bag of meth ingested by smoking and 4 tall beers[.]"

Defendant's blood was drawn at 9:17 p.m. It contained 0.14 percent alcohol and 100 nanograms methamphetamine per milliliter.

A criminalist testified as an expert on the effects of alcohol. The prosecutor presented the expert with a hypothetical question regarding a 150-pound male who started drinking at approximately 4:00 a.m. and finished drinking at approximately 11:00 a.m., consumed four 40-ounce malt liquors at six percent alcohol, and had a 0.14 percent blood-alcohol level at 9:17 p.m. The prosecutor asked the expert for his opinion regarding the male's blood-alcohol percentage at 1:00 p.m. The expert worked back from the 9:17 p.m. percentage and opined that the percentage at 1:00 p.m. would have been between 0.14 and 0.31. The prosecutor then asked the expert to consider the same question, but without

9

considering the 9:17 p.m. percentage. The expert worked forward from the alcohol consumed and answered that the percentage at 1:00 p.m. would have been 0.18. The prosecutor asked the expert variations on these hypothetical questions.

A toxicologist testified that defendant's blood would have contained about 200 nanograms per milliliter at about 1:00 p.m. The toxicologist testified that methamphetamine can impair a person's ability to drive, but the toxicologist could not form an opinion regarding whether defendant was impaired at the time he was driving because the toxicologist did not know when defendant ingested the methamphetamine, how much he ingested, how often he ingested it or any facts regarding his physical or mental performance that day. The toxicologist explained that the effect of methamphetamine in general is "to rev your body up for action [like] the fight or flight reaction...." It can make a person more alert and can counteract some of the effects of a central nervous depressant, such as alcohol.

A few months before the collision, on May 11, 2006, at about 11:10 p.m., an officer stopped defendant after witnessing him back a van into the wrong lane of traffic. The officer observed that defendant had a strong odor of alcohol, slurred speech and red, watery eyes. Furthermore, defendant did not have a license. He said he had consumed two beers at about 6:30 that evening. The officer arrested defendant for driving under the influence and took him to jail.

Defense Evidence

Defendant testified that on July 3, 2006, he drank three 16-ounce King Cobra beers between about 8:00 and 9:00 a.m. He explained he was carrying a black CD case when he realized he was being followed by four gang members. He ran to the truck and drove away to save his life. He tried to brake before he got to the curve ahead of the stop sign, but the brakes did not work.

After the collision, he ran to where he saw a friend, who drove him to a store and gave him ten dollars to buy beer. He bought two 40-ounce King Cobra beers and began to drink them. He saw the four gang members again and called the police to report that he was being beat up. He hid inside the van so the men would not find him. He tried to start the van so he could flee if necessary.

On cross-examination, defendant admitted not having a driver's license. He did not remember telling officers that he did stupid things when he was drunk.

10

Rebuttal Evidence

An officer testified that when he interviewed defendant after his arrest, defendant first claimed that a friend named Jose had been driving the truck. Then defendant admitted crashing the truck. He admitted he was drunk at the time of the crash and he said he did stupid things when he was drunk. He said he drank four 16-ounce beers the morning of the collision. He said he got in the truck and adjusted the radio to his favorite station. Prior to the collision, he was traveling approximately 65 miles per hour. He did not mention being chased by anyone. He said he braked late going into the curve. After the collision, he was afraid of the fire and feared the truck would explode.

(Resp.'s Ex. A, doc. 17-1, 2-10.)

IV.   Standard and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000).  It is thus the governing legal principle or principles set forth by the Supreme Court at the pertinent time. Lockyer v. Andrade, 538 U.S. 71-72.

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002). A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407. An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable. Williams, 529 U.S. at 410.

A state court's determination that a claim lacks merit precludes federal habeas relief as long as it is possible that fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. Id. In order to obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in

12

existing law beyond any possibility for fairminded disagreement."
Id. at 786-87.  The standards set by § 2254(d) are "highly
deferential standard[s] for evaluating state-court rulings" which
require that state-court decisions be given the benefit of the
doubt, and the Petitioner bear the burden of proof.  Cullen v.
Pinholster, 131 S. Ct. at 1398.

In assessing under section 2254(d)(1) whether the state
court's legal conclusion was contrary to or an unreasonable
application of federal law, "review... is limited to the record
that was before the state court that adjudicated the
claim on the merits."  Cullen v. Pinholster, 131 S. Ct. at 1398.
Evidence introduced in federal court has no bearing on review
pursuant to § 2254(d)(1).  Id. at 1400.

V.   Sufficiency of the Evidence of Implied Malice

A.   Decision on the Merits and the Last Reasoned
Decision

In determining the appropriate deference to be given to a
state court decision, it must be determined whether the decision
was on the merits within the meaning of 28 U.S.C. § 2254(d),
which limits habeas relief with respect to "any claim that was
adjudicated on the merits in State court proceedings...."  A
state has adjudicated a claim on the merits within the meaning of
§ 2254(d) when it decides the petitioner's right to relief on the
basis of the substance of the constitutional claim raised, rather
than denying the claim because of a procedural or other rule
precluding state court review of the merits.  Lambert v.
Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).

Here, the DCA decided both of Petitioner's claims on the

13

basis of their substance, and thus the DCA's decision was a

decision on the merits.  However, the later decision of the

California Supreme Court denying Petitioner's petition for

discretionary review of the DCA's decision was not a decision on

the merits, but rather was only a determination that the

California Supreme Court would not consider the case on the

merits.  <u>Williams v. Cavazos</u>, 646 F.3d 626, 636 (9th Cir. 2011),

<u>petition for cert. filed</u>  80 BNA USLW 3282 (Oct. 10, 2011) (No.

11-465) (citing <u>Harrington v. Richter</u>, – U.S. -, 131 S.Ct. 770,

784-85 (2011); Cal. R. Ct. 8.500; and <u>Campter v. Workers' Comp.</u>

<u>Appeals Bd.</u>, 3 Cal.4th 679 (1992)).

    The last reasoned decision must be identified in order to

analyze the state court decision pursuant to 28 U.S.C.

§ 2254(d)(1).  <u>Barker v. Fleming</u>, 423 F.3d 1085, 1092 n.3 (9th

Cir. 2005); <u>Bailey v. Rae</u>, 339 F.3d 1107, 1112-13 (9th Cir.

2003).  Here, the DCA's decision was the last reasoned decision

in which the state court adjudicated Petitioner's claims on the

merits.  Where there has been one reasoned state judgment

rejecting a federal claim, later unexplained orders upholding

that judgment or rejecting the same claim are presumed to rest

upon the same ground.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803

(1991).  This Court will thus "look through" the unexplained

decision of the California Supreme Court to the DCA's last

reasoned decision as the relevant state-court determination.  <u>Id.</u>

at 803-04; <u>Taylor v. Maddox</u>, 366 F.3d 992, 998 n.5 (9th Cir.

2004).

///

       B.   <u>The State Court Decision</u>

The pertinent portions of the DCA's decision on Petitioner's claim concerning the sufficiency of the evidence are as follows:

I. Motion for Judgment of Acquittal

At the conclusion of the prosecution's case-in-chief, defense counsel unsuccessfully moved for a judgment of acquittal on counts 1 through 10, pursuant to section 1118, which provides:

"In a case tried by the court without a jury, a jury having been waived, the court on motion of the defendant or on its own motion shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading after the evidence of the prosecution has been closed if the court, upon weighing the evidence then before it, finds the defendant not guilty of such offense or offenses. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right." FN4

> FN4. Section 1118.1 provides for the same motion in a jury trial.

On a motion for judgment of acquittal under section 1118, the trial court must consider whether there is any substantial evidence of the existence of each element of the offense charged, sufficient to find the defendant guilty beyond a reasonable doubt. *(See People v. Harris* (2008) 43 Cal.4th 1269, 1286 [§ 1118.1]; *People v. Cole* (2004) 33 Cal.4th 1158, 1212-1213.) The sufficiency of the evidence is tested at the point the motion is made. (§ 1118; *see People v. Stevens* (2007) 41 Cal.4th 182, 200; *People v. Cole, supra*, at p. 1213.)

Appellate review following the denial of a section 1118 motion requires examination of evidence on the record up to the time of the motion to determine if the evidence was legally sufficient at that point to sustain a verdict of guilty. (*People v. Trevino* (1985) 39 Cal.3d 667, 695 [§ 1118.1 motion; where motion is made at the close of prosecution's case-in-chief, reviewing court tests sufficiency of the evidence "as it stood at that point"; discussing the policies underlying that rule of law], overruled on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194; *People v. Ringo* (2005) 134 Cal.App.4th 870, 880 [§ 1118 motion; "reviewing court must view the evidence as it stood at the end of the prosecution case"]; *People v. Smith* (1998) 64 Cal.App.4th 1458, 1464 [§ 1118.1 motion; reviewing court considers only the evidence in the record at the close of the prosecution's case].) FN5 The question is one of law, subject to independent review. (*People v. Cole, supra*, 33 Cal.4th at p. 1213.)

15

FN5. Thus, California does not apply the
federal waiver rule, which holds that "where
a defendant testifies after the denial of a
motion to dismiss and that testimony supplies
any deficiency in the prosecution's case, he
may not complain on appeal of the erroneous
denial of the motion...." *(In re Anthony J.*
(2004) 117 Cal.App.4th 718, 730.)

We therefore examine the record up to the point of
defendant's motion to determine the sufficiency of the
evidence-that is, "'whether [the record] contains
evidence that is reasonable, credible, and of solid
value, from which a rational trier of fact could find
the defendant guilty beyond a reasonable doubt.'"
(*People v. Bolden* (2002) 29 Cal.4th 515, 553.) We view
the record in the light most favorable to the
prosecution and we draw all reasonable inferences in
support of the judgment. (*Ibid.; People v. Wader* (1993)
5 Cal.4th 610, 640.)

...

III. Sufficiency of the Evidence-Second Degree Murder

Defendant also contends there was insufficient evidence
of implied malice to support the second degree murder
convictions in counts 1 through 5. He argues there was
insufficient evidence that he was subjectively aware
that his conduct endangered the lives of others. He
again points to missing evidence of intoxication. We
find these contentions without merit.

"Murder is the unlawful killing of a human being ...
with malice aforethought." (§ 187, subd. (a).) "Such
malice may be express or implied. It is express when
there is manifested a deliberate intention unlawfully
to take away the life of a fellow creature. It is
implied, when no considerable provocation appears, or
when the circumstances attending the killing show an
abandoned and malignant heart." (§ 188.) Stated another
way, "[m]alice is implied when the killing is
proximately caused by '"an act, the natural
consequences of which are dangerous to life, which act
was deliberately performed by a person who knows that
his conduct endangers the life of another and who acts
with conscious disregard for life."' [Citation.] In
short, implied malice requires a defendant's awareness
of engaging in conduct that endangers the life of
another-no more, and no less." (*People v. Knoller*
(2007) 41 Cal.4th 139, 143; *see also People v. Taylor*
(2004) 32 Cal.4th 863, 868.) This is a subjective
standard: the defendant must have actually appreciated
the risk involved. (*People v. Watson* (1981) 30 Cal.3d
290, 297.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14

We conclude there was also sufficient evidence on the record at the end of the prosecution's case to support the finding of implied malice. Ample evidence established defendant was put on notice that his driving was dangerous to the lives of those around him and he continued to drive despite his awareness of the risk he posed. He drank alcohol and ingested methamphetamine that morning. He previously had been arrested for driving under the influence. He drove a stolen truck attached to a piece of heavy equipment, the handling and braking of which would naturally be different than an ordinary vehicle. He not only had no special license to operate the vehicle, he had no driver's license at all. He was in fact unable to control the rig, to the point that he could not keep it in the correct lane or even on the road. He nearly collided head-on with an oncoming driver, who had to take evasive action to prevent a potentially fatal collision. Defendant's fearful expression as he drove indicated he was aware of his inability to drive the rig safely. But, instead of slowing down or stopping the rig, he proceeded at a high speed, knowing he was unable to control the rig. He finally attempted to brake, but it was too late. He ran the stop sign and killed an entire family. We have no reservations regarding the quantum of evidence supporting the five murder convictions in this case.

15   (Doc. 17-1, 10-14.)

16          C.   Legal Standards

17   To determine whether a conviction violates the

18   constitutional guarantees of due process of law because of

19   insufficient evidence, a federal court ruling on a petition for

20   writ of habeas corpus must determine whether any rational trier

21   of fact could have found the essential elements of the crime

22   beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,

23   319, 20-21 (1979); Windham v. Merkle, 163 F.3d 1092, 1101 (9th

24   Cir. 1998); Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997);

25   Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1993) (en banc).

26          All evidence must be considered in the light that is the

27   most favorable to the prosecution. Jackson, 443 U.S. at 319;

28   Jones, 114 F.3d at 1008. It must be recognized that it is the

trier of fact's responsibility to resolve conflicting testimony, weigh evidence, and draw reasonable inferences from the facts; thus, it must be assumed that the trier resolved all conflicts in a manner that supports the verdict. Jackson v. Virginia, 443 U.S. at 319; Jones, 114 F.3d at 1008. The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but rather whether the jury could reasonably arrive at its verdict. United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991). Circumstantial evidence and the inferences reasonably drawn therefrom can be sufficient to prove any fact and to sustain a conviction, although mere suspicion or speculation does not rise to the level of sufficient evidence. United States v. Lennick, 18 F.3d 814, 820 (9th Cir. 1994); United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990); see, Jones v. Wood, 207 F.3d 557, 563 (9th Cir. 2000). The court must base its determination of the sufficiency of the evidence from a review of the record. Jackson at 324.

The Jackson standard must be applied with reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Windham, 163 F.3d at 1101.

Further, under the AEDPA, federal courts must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). This Court thus asks whether the state court decision being reviewed reflected an objectively unreasonable application of the Jackson standards to the facts of the case. Id. at 1275.

In California, second degree murder is the unlawful killing of a human being with malice aforethought but without the

additional elements, such as use of specified means or proof of additional mental states such as willfulness, premeditation, and deliberation, that would support a conviction for first degree murder.  Cal. Pen. Code §§ 187(a), 189; People v. Knoller, 41 Cal.4th 139, 151 (2007).  Malice may be either express, where there is manifested a deliberate intention to take away the life of a fellow creature, or implied, where there is an absence of considerable provocation, or when the circumstances attending the killing show an abandoned and malignant heart.  Cal. Pen. Code § 188.  The test for implied malice was recently reaffirmed and restated as follows:

> Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" (People v. Phillips, supra, at p. 587, 51 Cal.Rptr. 225, 414 P.2d 353.) In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another--no more, and no less.

People v. Knoller, 41 Cal.4th at 143.

        D.   Analysis

Here, the state court considered Petitioner's claim concerning the sufficiency of the evidence as of the time that Petitioner's trial counsel made a motion pursuant to Cal. Pen. Code § 1118.  (Doc. 17-1, 10-11.)  However, although the state court did not consider the entire body of evidence, the state court did articulate standards concerning the sufficiency of the evidence that are consistent with the Jackson standards.  (Id. at 10-12.)

In its decision, the DCA noted the evidence that Petitioner

engaged in conduct that was dangerous to human life, including his ingestion of drugs and alcohol, his lack of a special license to operate the truck he stole, his appropriation and operation of a truck attached to a heavy piece of equipment that would require abnormal handling and braking, his operation of the vehicle without being able to keep it in the correct lane or even on the road, and his nearly colliding head-on with an oncoming driver, who had to take evasive action to prevent a potentially fatal collision. (Id. at 14.) This evidence warranted a rational trier of fact in finding beyond a reasonable doubt that Petitioner engaged in conduct which naturally resulted in the creation of danger to human life.

The DCA further relied on the evidence that Petitioner was put on notice that his driving was dangerous to the lives of those around him, including his having ingested drugs and alcohol, his lack of any special license to operate such a vehicle, his previous arrest for driving under the influence, his fearful expression as he drove by the truck with which he nearly collided, and his continuing to proceed at the high speed of about sixty miles an hour with the knowledge that he was unable to control the heavy rig. There could be no disagreement among fair-minded jurists that this evidence warranted a rational trier of fact in finding beyond a reasonable doubt that Petitioner was aware that he was engaging in conduct that endangered the lives of others. The state court did not unreasonably apply the standards of Jackson v. Virginia to the evidence before it.

Accordingly, the Court concludes that Petitioner has failed to show that the state court's decision concerning the

1  sufficiency of the evidence to support a finding of implied

2  malice was contrary to, or an unreasonable application of, the

3  standards of <u>Jackson v. Virginia</u>.

4      The Court thus concludes that Petitioner's claim should be

5  denied.

6      VI.  <u>Improper Hypothetical Questions</u>

7      Petitioner argues that the trial court erred in admitting

8  evidence in the form of expert opinion regarding Petitioner's

9  consumption of alcohol because 1) the evidence did not support

10 the facts posited in the hypothetical questions that elicited the

11 opinions; 2) there was insufficient evidence to support the

12 expert's opinion; 3) possible prosecutorial misconduct affected

13 the fairness of Petitioner's trial; and 4) unreliable and

14 irrelevant evidence was admitted.  Petitioner contends that use

15 of the presumption of regularity based on Cal. Evid. Code

16 § 664 did not render the incorrect evidentiary rulings harmless

17 in Petitioner's bench trial.  Petitioner argues that his rights

18 to due process and to a fair trial were violated.  (Pet. 5

19 [referring to the pet. for rev., LD 7, 11-14].)

20      A.  <u>Additional Background</u>

21     Criminalist Richard Deslate testified that alcohol acts as a

22 depressant of the central nervous system, including the brain,

23 spinal cord, and all peripheral nerves, which in turn affect

24 other organs and muscles.  At a blood alcohol level of .07, most

25 people would exhibit impairment of perception, but all people

26 would at a level of .08.  (LD 3, 11 RT 3006-3015.)  At a level of

27 .07, reaction time would be affected.  (<u>Id.</u> at 11 RT 3014.)  At a

28 blood alcohol level of .09, symptoms of impairment would include

21

imbalance, slurred speech, effect on sensory motor coordination, and gross visual disturbances. (Id. at 11 RT 3013-3014.)  There were also impairments of judgment, control, attention, and perception of time, speed, and distance, which combine to render an impaired person unsafe to drive a vehicle. (Id. at 11 RT 3015.)  (Id.)  The average rate at which alcohol is eliminated, which begins as soon as alcohol is in the blood, is .02 percent per hour; persons of different weights burn off alcohol at the same rate.  (Id. at 11 RT 3012-3013.)

The following colloquies occurred concerning hypothetical questions posed to the criminalist by the prosecutor, Ms. Mitchell:

> Q  Okay.  You assume a male weighing 150 pounds, five feet nine inches tall, started drinking approximately 4 a.m., finished drinking approximately 11 a.m., during that time drank four, 40-ounce malt liquors at six percent alcohol by volume, drove at 1 p.m., a blood sample was taken at 9:17 p.m.  No alcohol is consumed between 11 a.m., and the time of the blood draw–at the time of the blood draw the alcohol level was .14.  The blood alcohol–the blood alcohol–the blood analysis also showed 100 nanograms per milliliter of methamphetamine and 29 nanograms of amphetamines, okay.
>
> What is your opinion as to what the blood alcohol level was of this man at the time of driving, which is one 1 o'clock p.m.?
>
>   MR. COLLINS:  Judge, before he answers, I'd like to object.
>
> And the basis of my objection is, number one, there's been no evidence that's been allowed into this court regarding four, 40-ounce bottles.
>
> We heard from the paramedic.  No one said 40 ounces.  It was four tall beers.  There's no rate of consumption There's no–there's no accounting for this amount of time.  I think its an improper hypothetical.  It's not based on any evidence we've heard so far.
>
>   THE COURT:  Well, that's not the test.  The test is

1   whether or not it's within the realm of evidence.
    It's a potential that's been established. And I
2   don't think it's significant that it's-that it's
    four and all anyway.
3
    I think what she's trying to get to with this
4   question is getting an opinion as to whether or not
    what the blood alcohol was at the time of the accident
5   based on the hypothetical that she asked. And I
    think that's within the realm of the evidence that
6   I've heard so far.

7   So the objection's noted for the record and overruled.

8   (Id. at 11 R.T. 3015-3017.)

9        After the court and the parties agreed that the criminalist

10  was not qualified to testify on the effects of methamphetamine or

11  amphetamine on the human body, the criminalist was directed to

12  answer the question concerning his opinion as to the blood

13  alcohol level at the time of driving at 1 o'clock. (Id. at 11 RT

14  3017.) The proceedings then continued:

15       A  The elapsed time between 1 o'clock to 9:17 is
         eight and a quarter hours. And the total burn off of
16       alcohol for that eight and a quarter hours is roughly
         .16.
17       So, if you add that to the result of .14, the
         alcohol concentration of the subject at 1 o'clock
18       would be between .30 to .31. That is using the average
         burn off rate of .02 per hour. If you use a different
19       rate, it's a little bit lower. Then it would be
         a little bit lower than .30, .31.
20
    (Id. at 11 RT 3018.)
21
22       The expert was then asked to answer the same question

23  concerning consumption of 40 fluid ounces but without the

24  information as to the blood draw at 9 o'clock. The criminalist

25  responded as follows:

26       A  The blood alcohol concentration of that individual
         at 1 o'clock would be .18, because of the burn off
27       that's totaled from starting at 5 o'clock up to
         1 o'clock, which is nine hours. And that burn off
         would be equivalent to .18, as well.
28       The equivalent of the four 40-fluid ounces of

23

six percent malt in a person theoretically would
be .36.  So you subtract .18 from .36 would give
you .18 blood alcohol concentration at 1 o'clock.

(Id. at 11 RT 3018.)[3]

There was extensive cross-examination of the criminalist.

_____

[3] The Court notes that the use of the hypothetical continued:
Q  Okay.  Al right.  We're going to continue with
adding more to the hypothetical.
If you assume at 1 o'clock the person was driving
a one-ton pickup truck, with a 22-foot long trailer,
upon which was loaded a bulldozer that he'd never
driven before, that he had no driver's license to
drive this, within minutes of stealing the truck
he drove approximately 65 miles per hour along a
fairly straight road for a little less than two
miles, weaving in and out of his lane into oncoming
traffic, with the tires on one side of his vehicle
completely off the pavement, almost crashed into an
oncoming truck that had pulled off the road to avoid
him, missed that truck by less than three feet, ran
through a stop sign and crashed into a small car and
guardrail, that he said he was drunk and drives better
when he's drunk and-um scratch that.
Do you have an opinion as to whether these facts are
consistent with a person under the influence of
alcohol for the purposes of driving at 1 o'clock?
A  Yes.
Q  Why?
     MR. COLLINS: Judge, I'd again objection regarding
all the traffic conditions.  I don't know if he's an
expert regarding the traffic situation or the cause
of the accident or th weaving or anything like that.
Or the trailer or anything of how the trailer would affect
his opinion.
     THE COURT:  The objections' noted for the record and
overruled.
  BY MS. MITCELL:
Q  You may answer why you formed that opinion, sir?
A  The manifestations of impairment are manifested
in the form of weaving of in and out and unable to
control the wheels.  The fact that the person almost
hit one truck before hitting another car, would point
to the fact that it's also a manifestation of impairment.
And given that the blood alcohol concentration of that
person at 1 o'clock would either be .18 just based on
the number of drinks that he had consumed, disregarding
the alcohol result that was drawn at 9:16 would be .18.

Now, if you disregarded the number of drinks that was
consumed and you based it on the result at 9:17 of
.14 blood alcohol concentration, all those point to
the fact that he was actually under the influence of
alcohol while he was driving.

(Id. at 11 RT 3018-3020.)

1    (Id. at 11 RT 3023-3034.)  It was established that if the person

2    had a .18 blood alcohol with elimination at 1:00 p.m., the result

3    at 9:17 p.m. would be between .01 and .02.  (Id. at 11 RT 3023-

4    24.)  The expert testified that mental aspects of impairment,

5    such as perception of time, speed, and distance, did not vary

6    based upon the drinker's alcohol tolerance, but the physical

7    manifestations did, such that a .30 blood alcohol level would

8    mean unconsciousness for some, but a .40 in others would not

9    prohibit completing a breath test and being able to follow

10   instructions.  (Id. at 11 RT 3025.)  The expert admitted that if

11   additional information were added to the hypothetical questions,

12   such as changed information as to the rate of consumption of

13   alcohol, the person's individual tolerance, or the person's

14   previous skill and experience with driving, the answers could

15   vary; some of those factors were beyond the expertise of the

16   witness, such as the effect of drugs, which was not considered in

17   the hypothetical.  Further, if the four beers consumed between 4

18   a.m. to 11 a.m. were sixteen ounces instead of forty ounces, the

19   blood alcohol level at l p.m. would be zero.  (Id. at 11 RT 3026-

20   34.)

21        During counsel's argument on the motion pursuant to Cal.

22   Pen. Code § 1118, it was argued that there was no evidence that

23   the beers were forty ounces or that Petitioner consumed the beers

24   at any precise time period.  The parties stipulated that the

25   statement of Petitioner that he had drunk three beers some time

26   between eight a.m. and the accident (trial exhibit 46) be

27   stricken and that the trial court disregard it.  (LD 3, 12 RT

28   3400-3502, 3506-07.)  Defense counsel argued that the

hypothetical evidence was of questionable weight because there was no clear evidence of when Petitioner drank the beers, and no clear evidence of Petitioner's conduct between the accident and his apprehension.  (Id. at 12 RT 3515.)

In ruling on the 1118 motion, the trial judge indicated that it could consider the Petitioner's use of methamphetamine.  The court stated the following in pertinent part:

> THE COURT:  Okay.  Yeah, Counsel's right.  This is a motion under 1118 since it's a court trial.
>
> And I've considered the arguments and considered the evidence that's been presented.
> ...
>
> There also is a factor that he was–had to have been drinking alcoholic beverages.  I agree with counsel again.  I think there's a certain doubt as to what actually consumed (sic).  I think they kept on trying to get him to say he did the 40 ounces, but I don't think even in the statement, which has been stricken, he even admitted that.  But I don't know if that's particularly relevant whether its 40 ounces or 20 ounces.
>
> When you look at the analysis as it's done by the criminalist they look at the fact what the blood alcohol is at the time and it's a 1.8–a 1.4.  And then they backtrack.  And the only factor that can impact the blood alcohol at that time is whether or not the person in this case, the defendant, had consumed alcohol because that would effect (sic) the thing.
>
> Assuming, based on the hypothetical, there had not been any consumption of alcohol, which is what the hypothetical is what the court has to rely on in terms of the evidence, and you backtrack all of the absorption rate, the 3.0 is certainly reasonable evidence that exists.

(Id. at 12 RT 3517-3518.)

The court then noted that Petitioner was under the influence of alcohol as far as the court was concerned to the extent that it affected the ability to operate a vehicle in a safe and

1  prudent manner, and the court would then look at the acts that
2  occurred in making a determination of whether Petitioner had a
3  conscious disregard for life. (Id. at 12 RT 3518.)  The court
4  then proceeded to consider Petitioner's conduct, including theft
5  of the truck with a tractor trailer, driving the tractor trailer
6  without the skill, experience, or licensing necessary to do so,
7  driving at a high rate of speed on the wrong side of the road
8  despite inability to control the vehicle, running a driver coming
9  in the opposite direction off the road, continuing to drive at a
10 high rate of speed on a rural road, and going right through the
11 intersection with the stop sign.  The court concluded that the
12 natural consequences of these many acts were danger to human
13 life, and that there was evidence of consciousness of the danger
14 to life and disregard thereof.  The court then denied the 1118
15 motion. (Id. at 12 RT 3518-3520.)

16      In closing argument to the court, the prosecutor noted that
17 one driving a commercial vehicle could not have a blood alcohol
18 over .04.  (Id. at 13 RT 3715.) The prosecutor mentioned
19 Petitioner's statement to Officer Shepard that he drank four
20 sixteen-ounce beers and noted the expert testimony of certain
21 impairment at .08, probable impairment at .07, and possible
22 impairment at .05.  The prosecutor stated that although
23 Petitioner's blood alcohol was .14 when arrested hours later, it
24 was not known what the blood alcohol was at the time of the
25 collision.  The following colloquy occurred:

26      THE COURT:  Well, don't we?
27      MS. MITCHELL [PROSECUTOR]: But he-
28      THE COURT:  We don't?  We do, don't' we?

1    MS. MITCHELL:  Yes.

2    THE COURT:  Right.  When you said we don't (sic) what
     it was at the time of the collision but you have your
3    expert witness that testified that he believed it to be
     a .30.  And the only thing that's come in to the contrary
4    since that period of time has been the defendant's
     subsequent statement about, yeah, he consumed alcohol
5    after the collision which may have impacted, you
     know, that reading if it's believed.  Correct?

6    MS. MITCHELL:  Yes, sir.

7    THE COURT:  Okay.

8  (LD 3, 13 RT 3715-3716.)

9       The prosecutor emphasized that it was unknown how much

10 Petitioner had to drink and that he could have had more than

11 three or four; however, she also argued that evidence of his

12 impairment was provided by Petitioner's near collision with

13 McCann before the fatal collision and his inability to compensate

14 correctly.  (Id.)

15      In his closing argument, defense counsel argued that the

16 opinion that the blood alcohol level was .30 based on the test

17 result at 9:17 coupled with passage of time was not enough to

18 meet the burden of the People to prove guilt beyond a reasonable

19 doubt.  He noted the People's argument that Petitioner had lied

20 about drinking after the accident and that the trial court could

21 conclude that Petitioner was lying, but he argued that the record

22 provided corroboration of Petitioner's version of the events.

23 (LD 3, 13 RT  3728-3729.)

24      In rebuttal, the prosecutor noted inconsistencies in

25 Petitioner's recollection of details on the day of the collision

26 and the absence of corroboration for Petitioner's testimony.

27 (Id. at 13 RT 3740-3743.)

28

                                  28

B.   The State Court's Decision

The state court's decision on Petitioner's claim concerning the hypothetical questions and the evidence elicited in connection therewith was as follows:

IV. Drinking Hypothetical

Defendant lastly contends the trial court erred by allowing a prosecution expert to offer opinions based on improper hypothetical questions regarding alcohol consumption. Defendant argues there was no evidence to support the facts of the hypothetical questions and therefore they constituted prosecutorial misconduct. Alternatively, he contends the expert's opinions in response to the questions were inadmissible because they lacked adequate evidentiary foundation or because they were unreliable and irrelevant.

We believe any error resulting from the prosecutor's hypothetical questions was harmless. *(See People v. Boyette* (2002) 29 Cal.4th 381, 448-453 [prosecutor's hypothetical question based on facts not in evidence constitutes misconduct, which is subject to harmless error analysis]; *People v. Dean* (2009) 171 Cal.App.4th 1252, 1264-1265 [erroneous admission of expert testimony is subject to harmless error analysis].) As we concluded above, there was substantial evidence that defendant was intoxicated while driving, even without the evidence obtained through the hypothetical questions (upon which we did not rely to reach that conclusion). Moreover, the allegedly improper testimony produced with the hypothetical questions was elicited in a court trial without a jury, and absent a contrary showing, we will presume the court disregarded irrelevant matters and followed the law. *(See, e.g., Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 606 [presumption court considered only admissible evidence]; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913 [presumption court followed proper standard]; *People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [court presumed to have considered only relevant evidence].) In sum, it is not reasonably probable defendant would have received a more favorable verdict had the trial court prohibited the prosecutor from asking the hypothetical questions. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Because we do not believe any error here rose to federal constitutional dimensions, we need not apply the higher standard of *Chapman v. California* (1967) 386 U.S. 18.

1  (Doc. 17-1, 14-15.)[4]

2          C.  <u>Legal Standards</u>

3               1.  <u>State Law Evidentiary Claims</u>

4       A federal court reviewing a habeas petition pursuant to 28

5  U.S.C. § 2254 has no authority to review alleged violations of a

6  state's evidentiary rules.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918,

7  919 (9th Cir. 1991).  Because federal habeas relief is available

8  to state prisoners only to correct violations of the United

9  States Constitution, federal laws, or treaties of the United

10 States, federal habeas relief is not available to retry a state

11 issue that does not rise to the level of a federal constitutional

12 violation. 28 U.S.C. § 2254(a); <u>Wilson v. Corcoran</u>, 562 U.S. — ,

13 131 S.Ct. 13, 16; <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).

14 In a habeas corpus proceeding, this Court is bound by the

15 California Supreme Court's interpretation of California law

16 unless it is determined that the interpretation is untenable or a

17 veiled attempt to avoid review of federal questions.  <u>Murtishaw</u>

18 <u>v. Woodford</u>, 255 F.3d 926, 964 (9th Cir. 2001).

19

20               2.  <u>Federal Due Process Limitations on the</u>
                   <u>Admission of Evidence</u>

21

22      With respect to the admission of relevant evidence contended

23      ────────────────────

         [4] The state court had previously concluded in connection with the
24 convictions of gross vehicular manslaughter, which required proof of driving a
   vehicle while intoxicated, that there was substantial evidence of Petitioner's
25 intoxication while driving even without the evidence obtained through the
   hypothetical questions.  The standard of intoxication applied by the court was
26 whether as a result of consuming alcohol or drugs, the driver's physical or
   mental abilities were impaired so that he no longer had the ability to drive a
27 vehicle with the caution characteristic of a sober person of ordinary prudence
   under the same or similar circumstances.  The evidence relied on by the court
28 included Petitioner's driving over the speed limit, swerving all over the
   road, nearly driving off the road, almost hitting a truck head-on, and failing
   to brake in time for a stop sign.  (Doc. 17-1, 12-13.)

                                    30

to be unreliable, the primary federal safeguards are provided by

the Sixth Amendment's rights to counsel, compulsory process to

obtain defense witnesses, and confrontation and cross-examination

of prosecution witnesses; otherwise, admission of evidence in

state trials is ordinarily governed by state law. Perry v. New

Hampshire, 565 U.S. -,  (2012), -S.Ct.-, 2012 WL 75048, *5 (No.

10-8974, Jan. 11, 2012) (determining that the Due Process Clause

does not require a trial judge to conduct a preliminary

assessment of the reliability of eyewitness identification made

under suggestive circumstances not arranged by the police). The

reliability of relevant testimony typically falls within the

province of the jury to determine. Id. at *10. Absent improper

police conduct or other state action, it is sufficient to test

the reliability of evidence through the normal procedures,

including the right to counsel and cross-examination, protective

rules of evidence, the requirement of proof of guilt beyond a

reasonable doubt, and jury instructions. Id. at *3.

To be entitled to relief in habeas corpus proceedings, a

petitioner generally must show that a trial error resulted in

actual prejudice. Brecht v. Abrahamson, 507 U.S. 619, 637

(1993). Constitutional trial errors occurring during the

presentation of evidence to the jury are generally subject to

harmless error analysis, which is tested on habeas corpus review

by determining whether any error had a substantial and injurious

effect or influence in determining the jury's verdict. Id.

(applying the standard to habeas review of Doyle violations

concerning introduction of a defendant's post-Miranda warning

silence). However, a claim that the Due Process Clause was

31

violated by the admission of evidence alleged to have been
prejudicial involves determining whether the evidence was so
arbitrary or prejudicial that its admission rendered the trial
fundamentally unfair and violated fundamental conceptions of
justice.  Perry v. New Hampshire, 2012 WL 75048, *5; Estelle v.
McGuire, 502 U.S. at 67-69; Holley v. Yarborough, 568 F.3d 1091,
1101 (9th Cir. 2009).  Further, even the clearly erroneous
admission of evidence that renders a trial fundamentally unfair
may not permit the grant of habeas relief unless forbidden by
clearly established federal law as established by the Supreme
Court.  Holley v. Yarborough, 568 F.3d at 1101.  The Supreme
Court has not yet made a clear ruling that admission of
irrelevant or overtly prejudicial evidence constitutes a due
process violation sufficient to warrant issuance of the writ, and
absent such clearly established federal law, it cannot be
concluded that the state court's ruling was an unreasonable
application.  Id. (citing Carey v. Musladin, 549 U.S. 70, 77
(2006)).

It has been held in this circuit that admission of evidence
violates due process only if there are no permissible inferences
that a jury may draw from it, and the evidence is of such quality
as necessarily prevents a fair trial.  Boyde v. Brown, 404 F.3d
1159, 1172-73 (9th Cir. 2005) (quoting Jammal v. Van de Kamp, 926
F.2d 918, 920).

D.  Analysis

To the extent that Petitioner's claim rests on California
law, Petitioner does not state facts warranting relief in this
proceeding, in which the Court has no authority to review errors

of state law.

As noted in <u>Holley v. Yarborough</u>, 568 F.3d at 1101, in the absence of clearly established federal law based on the holdings of the Supreme Court, the admission of the allegedly irrelevant or prejudicial evidence cannot constitute a decision that is contrary to, or an unreasonable application of, clearly established federal law which would warrant relief in this proceeding.  There is no clear holding that introduction of analogous evidence violates due process and requires habeas relief.

However, this Court will proceed to consider more generally whether Petitioner's due process right to a fair trial was violated by admission of the criminalist's answer to the hypothetical questions.[5]

To the extent that the hypothetical questions depended on the Petitioner's ingestion of four forty-ounce beers, the record support for the hypothetical question was unclear because the nurse was told that Petitioner had four large or tall bottles of beer, not four forty-ounce bottles.  (LD 3, 10 RT 2852.) However, the testimony of the criminalist clearly reflected that the calculation of Petitioner's blood alcohol that rested on consideration of the blood alcohol reading taken at 9:17 p.m. was

---

[5] Although Petitioner's counsel objected only to the first and third hypothetical questions, the factual assumptions of the second hypothetical were identical to the first except for the omission of the results of the blood alcohol test taken at 9:17 p.m.  The court had ruled that the first question was proper because it was within the realm of evidence, and that further objection went to the weight and not the admissibility of the evidence.  (LD 3, 11 RT 3015- 3020.)  Petitioner's counsel did not object again until the prosecutor turned to "adding more to the hypothetical." (LD 3, 11 RT 3019.)  It is thus appears that objection to the second hypothetical would have been repetitive or futile.

1   reached by taking the result of the test and applying a uniform
2   rate of hourly alcohol burn-off or elimination multiplied by the
3   number of hours that had elapsed between the collision and 9:17
4   p.m.  The expert testified that the elapsed time was eight and
5   one quarter hours, making the total burn off roughly .16; adding
6   .16 to the .14 blood alcohol reading from 9:17 p.m. resulted in a
7   blood alcohol of between .30 and .31 at the time of the
8   collision.  (Id. at 11 RT 3017-3018.)  The expert confirmed in
9   response to the third hypothetical question that in reaching this
10  result, he disregarded the number of drinks that were consumed
11  and instead based the calculation on the blood alcohol test
12  result and burn-off.  (Id. at 11 RT 3020.)

13      Thus, the trial court correctly concluded that the precise
14  amount of alcohol consumed before the collision was not material
15  because the expert's method was to "backtrack," and only the
16  Petitioner's consumption of alcohol after the collision could
17  have affected that calculation.  In view of the multiple indicia
18  of Petitioner's poor credibility, the trial court could have
19  rejected Petitioner's subsequent testimony and any extrajudicial
20  statements that Petitioner had consumed alcohol in the interval
21  between the collision and before his apprehension.

22      Therefore, it may be concluded that the portion of the
23  expert opinion that Petitioner was under the influence based on
24  burn-off and the .14 test result from 9:17 p.m. permitted an
25  inference that Petitioner was under the influence of alcohol
26  based on a blood alcohol of approximately .30 at the time of the
27  collision.

28      However, even if it is assumed that no permissible

34

1   inferences were warranted by the opinions elicited in the
2   hypothetical questions, the state court decision that the
3   evidentiary ruling did not rise to the level of a federal
4   constitutional violation, and that Petitioner suffered no
5   actionable prejudice, was not contrary to, or an unreasonable
6   application of, clearly established federal law.  This is because
7   considering the totality of the circumstances reflected in the
8   record, the evidence did not prevent a fair trial or even have a
9   substantial and injurious effect on the trier's decision.

10       First, the argument on the motion made pursuant to § 1118
11  showed that the trial court acknowledged that the amount of
12  alcohol consumed by Petitioner before the accident was unclear.
13  Further, in its express review of the evidence introduced in the
14  prosecution's case, the court appeared to limit its consideration
15  of the expert's opinion to the portion based on backtracking from
16  the blood alcohol test result, as distinguished from the portion
17  based on Petitioner's pre-collision consumption of a particular
18  amount of alcohol.  The court also clearly relied on the
19  extensive evidence of Petitioner's conduct around the time of the
20  collision that reflected impairment or being under the influence
21  of alcohol at the pertinent time.

22       Further, the court's comments and questions during closing
23  argument reflected that it continued to understand the issues
24  presented with respect to the factual assumptions underlying the
25  expert's opinion.  The record presents a solid basis for a
26  conclusion that the trial court rejected Petitioner's credibility
27  and did not give the expert's opinions undue weight or take them
28  out of context.  This conclusion does not require the presumption

35

1   that the trial court's duty was regularly performed because the
2   trial court itself articulated this reasoning.

3       Finally, as the state court's decision reflected, even if it
4   were assumed that the introduction of the expert opinions in
5   response to the hypothetical questions was erroneous, it was not
6   unreasonable to conclude that the error did not rise to federal
7   constitutional dimensions or deprive Petitioner of a fair trial.
8   (Doc. 17-1, 15.)  The state court expressly noted that even
9   without considering the expert's opinions that were rendered in
10  response to the hypothetical questions, the record contained
11  significant and substantial evidence that Petitioner was
12  intoxicated while driving, including erratic driving immediately
13  before the collision and Petitioner's statements to the nurse
14  that he had consumed four beers and ingested methamphetamine that
15  morning. (Doc. 17-1, 12-13.)

16      In summary, it is concluded that Petitioner has not shown
17  that the state court's decision that admission of the evidence
18  was not sufficiently prejudicial and did not rise to the level of
19  a federal constitutional violation was contrary to, or an
20  unreasonable application of, clearly established federal law.

21      The Court thus concludes that Petitioner is not entitled to
22  relief on this claim.

23      VII.   Certificate of Appealability

24      Unless a circuit justice or judge issues a certificate of
25  appealability, an appeal may not be taken to the Court of Appeals
26  from the final order in a habeas proceeding in which the
27  detention complained of arises out of process issued by a state
28  court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537

36

1  U.S. 322, 336 (2003).  A certificate of appealability may issue

2  only if the applicant makes a substantial showing of the denial

3  of a constitutional right.  § 2253(c)(2).  Under this standard, a

4  petitioner must show that reasonable jurists could debate whether

5  the petition should have been resolved in a different manner or

6  that the issues presented were adequate to deserve encouragement

7  to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336

8  (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  A

9  certificate should issue if the Petitioner shows that jurists of

10 reason would find it debatable whether the petition states a

11 valid claim of the denial of a constitutional right and that

12 jurists of reason would find it debatable whether the district

13 court was correct in any procedural ruling.  Slack v. McDaniel,

14 529 U.S. 473, 483-84 (2000).

15     In determining this issue, a court conducts an overview of

16 the claims in the habeas petition, generally assesses their

17 merits, and determines whether the resolution was debatable among

18 jurists of reason or wrong.  Id.  It is necessary for an

19 applicant to show more than an absence of frivolity or the

20 existence of mere good faith; however, it is not necessary for an

21 applicant to show that the appeal will succeed.  Miller-El v.

22 Cockrell, 537 U.S. at 338.

23     A district court must issue or deny a certificate of

24 appealability when it enters a final order adverse to the

25 applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

26     Here, it does not appear that reasonable jurists could

27 debate whether the petition should have been resolved in a

28 different manner.  Petitioner has not made a substantial showing

1   of the denial of a constitutional right.

2       Accordingly, it will be recommended that the Court decline
3   to issue a certificate of appealability.

4       VIII.   <u>Recommendations</u>

5       Accordingly, it is RECOMMENDED that:

6       1)   The petition for writ of habeas corpus be DENIED; and

7       2)   Judgment be ENTERED for Respondent; and

8       3)   The Court DECLINE to issue a certificate of
9   appealability.

10       These findings and recommendations are submitted to the
11   United States District Court Judge assigned to the case, pursuant
12   to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of
13   the Local Rules of Practice for the United States District Court,
14   Eastern District of California.  Within thirty (30) days after
15   being served with a copy, any party may file written objections
16   with the Court and serve a copy on all parties.  Such a document
17   should be captioned "Objections to Magistrate Judge's Findings
18   and Recommendations."  Replies to the objections shall be served
19   and filed within fourteen (14) days (plus three (3) days if
20   served by mail) after service of the objections.  The Court will
21   then review the Magistrate Judge's ruling pursuant to 28 U.S.C.
22   § 636 (b)(1)(C).

23   /////
24   /////
25   /////
26   /////
27   /////
28   /////

The parties are advised that failure to file objections within

the specified time may waive the right to

appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d

1153 (9th Cir. 1991).

    IT IS SO ORDERED.

**Dated:**   **January 26, 2012**          /s/ **Barbara A. McAuliffe**

                                        UNITED STATES MAGISTRATE JUDGE